v. STB Good morning, and may it please the Court. After this Court vacated the Surface Transportation Board's first decision, the agency again ruled that Wisconsin Central cannot designate the Belt Railway's clearing yard here in Chicago to receive interchange traffic from Soo Line. The Board again made several legal and logical errors, but I'd like to focus on the fundamental substantive problem with the agency's analysis. In an explicit bid for quote-unquote interpretive leeway, the agency jammed its entire analysis into the statute's reasonableness prong, including the who-pays issue that this Court already held is a distinct downstream question. And in deeming clearing unreasonable, the agency relied on contested assumptions about the nature and extent of Soo Line's contractual commitments in the Belt Operating Agreement, even as the agency disclaimed construing that contract. The party signed the Belt Operating Agreement against the backdrop of a receiving railroad's established right to designate an interchange point and the settled industry custom that when interchange is effected through a third-party carrier like the Belt, it is the delivering carrier here, Soo Line, that pays the third party's fees. Nothing in the contract carves out the traffic at issue from that practice. On the contrary, the contract's plain language is consistent with the custom. It says that Soo Line will pay the Belt's fees for traffic that it delivers there, and that makes sense because those fees cover the costs of breaking apart and assembling trains, which is work that Soo Line would otherwise have to do itself. Yet the Board assumed throughout its opinion that Soo Line had not agreed to pay those fees, and thus based its entire analysis on the premise that Soo Line would unfairly be forced to pay while it did. Mr. Lockheed, forgive me, but let's just say that we agree with you that the Board could not consider who pays unless and until it determined that the interchange point was reasonable. Isn't the question of who pays the third party different from the question of is a designated interchange unreasonable because it is too costly for the delivering railroad? Why can't cost be part and maybe, maybe the most important part of the initial reasonableness determination? Absolutely, Your Honor. Costs are part of the initial reasonableness determination, and I appreciate the question because a lot of the appellate briefing from my friends on the other side has focused on establishing that costs as a general matter, various kinds of costs are part of the reasonableness determination. We agree. We do not dispute that, nor is our position that the STB can never consider whether, excuse me, which carrier needs to pay the third party's fees. Rather, our point on these issues being distinct is that as the Court already held in its first opinion, the first question is, does the carrier, the receiving carrier, have the power to designate? I have a very strange view of what a holding is. So, Your Honor, of course, I'm hesitant to try to tell any of you what was in the Court's mind. My reading of the- It doesn't matter one whit what was in the Court's mind. You were here for the last argument, surely. Fair enough, Your Honor. My best reading- You know what a holding is. I do, Your Honor. Right. We did not hold anything about the meaning of the word reasonable. Not a bit. It wasn't an issue in that case. I agree with that, Your Honor. It is an issue now. And therefore, what we said last time does not control now. You have to argue about the meaning of the word reasonableness and not assert that it's all water under the bridge. Fair enough, Your Honor. I will say, as to what the Court wrote in its opinion last time, the only observation I will make is that I think the Court did hold not anything about the substance of the reasonableness test, but that who pays the third party is a distinct question that is downstream from whether the interchange point is reasonable in the first place. But even if I'm wrong about that, that does not actually solve the problem with the Board's analysis here. Because even if you assume that considering who pays the third party was entirely appropriate for the Board to reach, notwithstanding Sue Lyon's earlier forfeiture and notwithstanding what the Court said about the order of analysis, the problem is still that the Board's analysis of who pays and thus fairness and thus reasonableness turned on its implicit interpretation of the belt operating agreement, even though it said in the same breath that it was not construing that contract. And that is the problem here, Your Honor, the ultimate substantive problem. The key insight of this Court's prior opinion, I think, was that in this context contracts matter. Our position is essentially that the belt operating agreement effectively provides, although admittedly not in so many words, that Sue Lyon will pay the belt's fees for traffic that it delivers to clearing, whether or not that traffic arrives there voluntarily or under a statutory designation. The Board's analysis assumes, however, that Sue Lyon's agreement to pay the belt's fees does not extend to traffic that arrives under a statutory designation. That much is clear in page S.A. 14, footnote 24, where the Board says it is declining to interpret this private contract, but noting, however, that from its perspective, the key issue is whether Wisconsin Central may unilaterally require Sue Lyon to exercise its rights. And it then proceeded from that premise as though we were trying to force Sue Lyon to pay fees that it had not agreed to pay. That is a contractual question. And the appellate. It's true that according to Sue's contractual agreement with the clearing yard, it bears the cost when it chooses to deliver there. But why should that separate agreement between Sue and the clearing yard dictate anything about the relationship between Wisconsin Central and Sue, especially when Wisconsin Central forces Sue to exchange at clearing yard? So two points there, Your Honor. First, I think the premise of your question is the same premise that the Board proceeded from, which makes assumptions about the limits of the contractual commitment. Our view is that the contract is not limited to paying fees for traffic that Sue voluntarily agrees to bring to clearing. That's the problem. Our position is that the contract effectively says, in light of the formation, the understanding among the parties, the industry custom and the statutory background, Sue will pay however the traffic gets there. And if we are right about that, the Board's entire analysis is wrong and proceeds from a premise because the Board claimed it was not construing the contract at all. As the second point, Your Honor, it's not a separate contract. We are parties to the belt operating agreement, too. It is a contract among the belt's co-owners, including Sue Lyon and Wisconsin Central and the belt. And the belt exists. The belt operating agreement exists precisely because the major carriers, including both parties here, need services of third party carriers like the belt to facilitate their interchange operations in Chicago. So it's not at all strange to say, at the very least, that the Board had to actually look at the terms of the contract, engage with the party's contractual arguments and construe the contract before it decided the question of who should pay under the contract. And yet that is not what it did. And the appellate briefing merely confirms the point. If you look at Sue Lyon's brief on page 12 and then again on page 49, Sue Lyon's explicit position is that it only agreed to pay for traffic that it might voluntarily bring. And it disputes the applicability of the belt railway agreement to, quote unquote, forced traffic. And the STB says essentially the same thing on page 26. Again, these are contractual arguments. They are, in the appellate briefing, explicit assertions in the Board's decision, implicit assumptions about what the parties did and did not agree to under the contract. And our position is merely that if the Board is going to decide a question that depends on the terms of a contract, it cannot say in one breath that it is not going to construe the contract and then in the next that the contract doesn't contemplate payment under these circumstances. In the same vein, the agency, on the one hand, invoked an industry custom that it said supported its position, which is the idea that if two carriers physically intersect, the receiving carrier must designate an interchange point on its own lines and provide the delivering carrier a free route there. But on the very next page of its own opinion, the Board rejected the industry custom that we invoked, which is that if interchange is affected through a third party carrier, the delivering carrier pays the fees for that on the grounds that that custom exists in the context of voluntary arrangements among railroads and not, quote unquote, forced arrangement. But all customs are voluntary. That's what makes them customs and not laws. The agency could not rely on a custom that supported its result and reject a custom that did not support its result because one of them is voluntary and the other. Why not? It might have to choose. Why can't it make a reasonable choice? It could choose between them, Your Honor, if the question were simply, which of these two customs do we think is more apt? The problem was the basis that it gave for rejecting the second custom, which is that it supposedly exists only in voluntary arrangements. That's what a custom is. So if a custom being voluntary is a reason that it cannot factor into the reasonableness analysis, that applies equally to the custom that the agency relied on as well as the one that we invoked. The problem is that the board tried to have it both ways. I, I, I'm afraid I may sound very simplistic, but help me out here. When two railroads interchange where there attracts me, it isn't really free for both parties. One of the railroads has to bear the expense of switching cars around or moving engines, you know, et cetera. And I assume that the receiver bears those costs, right? It does depend a little bit, Your Honor. In general, yes, the receiving railroad would certainly bear some costs. The exact proportion is going to depend. But yes, the receiving railroad has to accept the cars. It has to inspect them. It probably has to at least then take them to another yard, which is what happens in this case. When Wisconsin Central receives traffic in this area, say when parties were using Spaulding, that traffic would then go to Kirkyard to be classified, meaning broken up and then sent to other places. OK, then let's suppose that Sue had never entered into any agreements with the Belk Railway about who pays what and when. Would you agree that Wisconsin Central would have to bear the costs of interchanging at the clearing yard? I don't know that I would say that that would be the case no matter what. Certainly it would be a much harder argument for us because the contract is both the basis of our right to designate clearing in the first place, as the court held in the first opinion, and also the basis for our argument, consistent with industry custom, that Sue Lyon should pay. I do think that would be a closer case. And it would require the kind of case by case reasonableness analysis that we are not disputing is appropriate in general. The issue here is really that on a number of different issues, the board tried to have it both ways. And I will also note, apropos of your question, Judge Brogner, that sending this traffic to the Belt does save Sue Lyon work that it would otherwise have to do. That's what the fees cover. Sue Lyon can take all of the traffic that it wants to send to any of the Belt's other co-owners, pack it all together on one train without sorting it, send it to clearing, and the Belt sorts it, and that's work that Sue doesn't have to do with its own equipment and its own personnel. I see I have two minutes left. I'd like to, unless there are further questions now, reserve the balance of my time. Certainly, counsel. Thank you. Ms. Chaikin. May it please the Court. I'm Carolyn Chaikin on behalf of the Surface Transportation Board and the United States. This case really comes down to one key issue, and that is whether the board can consider the cost to each railroad, among other facts and circumstances, when assessing an interchange location's reasonableness under 10742. The board posed this specific question when seeking public commentary. All of the disinterested industry stakeholders at Sue Lyon and even Wisconsin Central here at their petitioner's brief 33 said the board can and should consider operational costs and savings to each party. Who pays what when determining an interchange facility's reasonableness, knowing that allocation is a key component to siting an interchange facility. And that is exactly what the Belt Railway fees are here. Like any other physical or operational complexity of an interchange location, having to interchange through Belt Railway and use Belt Railways, as opposing counsel noted, use Belt Railway services to move the cars from where Sue Lyon drops them off to where Wisconsin Central has to pick them up. That's an extra layer of complexity, operational potential inefficiencies, as well as choke points for delays and stuff that necessarily translates to added costs. And therefore, the board explained that it should, as all of the industry understands, be prepared to consider those types of costs when assessing, among all the other factors at issue when assessing locations reasonableness. Now, I mean, I heard several points that I definitely want to address here. The Wisconsin Central says that the board construed the contract, but that's not what the board did. The board was careful to say that what it was doing was assuming the conditions of Wisconsin Central's proposal. It was not proposing, it was not offering clearing for interchange under any other terms than Sue Lyon must pay those Belt Railway fees, all of that. Whether by contract or fairness or custom, they made a lot of arguments and the board did not weigh in on whether those arguments had weight. They simply said, we're going to accept your proposed designation of this location and consider it on its specific facts and circumstances. And what they attempt to do right now is to say that the existence of the Belt Railway operating agreement, which consisted with the record and the board's extensive experience with these types of permissive agreements that give permission, you know, there are agreements between the belt and any potential users that you can use these facilities under certain circumstances. That is, they're trying to argue that that somehow locks into place an acceptance by all of the six largest carriers in the nation at the largest interchanging terminal in the nation, that any time any other specific carrier designates clearing, then that carrier has to deliver there regardless of their individual traffic flows, capacities, resources at that point in time. And that is not, that's just, that's not how that should work. It shouldn't supersede, in other words, a reasonableness assessment under the statute. Whether Soo-Lin has to deliver at clearing depends on the language of the statute, as the court said in its last decision here. And the board respected the court's last decision, which left open the question of reasonableness, and it respected the framework that the court set forth. It issued a thorough, reasoned determination based on a multitude of factors and circumstances, one of which obviously is the costs, because costs is, I mean, as everyone has told the board, costs are the most important factor when deciding and knowing who pays, what proportion of those costs, the relative balance of those costs. You could have two interchange facilities, one of which is more costly, but has a more fair and equal balance of burdens and benefits and costs to the interchanging carriers. And I mean, truthfully, both of those interchange locations could be reasonable if they're relatively balanced and fair. You could also have an interchange location that is less costly overall and still, and would shift or place so much burden on one particular party than another for this particular traffic at this time under these circumstances, that it might not be a reasonable interchange facility, even though some of the costs overall would be lower there. So I definitely want to be sure to clarify that the board was not purporting to interpret a contract. It was trying to stay consistent with what the industry is telling it, that the industry, including two fellow signatories of the Belt Railway Operating Agreement here that are disinterested, Norfolk Southern and BNSF Railway, both came in to say to the board that as a general matter, we don't think that a receiving carrier designating a third party interchange location and requiring unilaterally the delivering carrier to pay 100 percent all of those fees would generally be reasonable. One of the questions asked in our earlier opinion, or at least the inquiries, was why in the world doesn't Belt Railway have a way of solving these problems for itself when its owners disagree? Why isn't Belt Railway or an arbitrator the right person to solve the disagreement? And I'm afraid I don't know the answer to that question. I don't, I mean, I would defer to my colleague at SU whether they know of any, but I don't, I don't believe that's in the agreement. Unfortunately, neither Wisconsin Central nor the SU line can speak for Belt Railway, which has lots of other owners. Right. And the truth is, I mean, the agreement, I mean, I think it comes down to the general nature of the agreement, that it is, it's giving, it's Belt Railway giving permission under certain circumstances to use its facilities. But all carriers in all this, the industry here and the board in its experience understands that that typically happens when the delivering carrier also agrees to  The reason we ask that question is that normally private parties prefer to resolve their disputes privately rather than go to a government agency and then come to a court of appeals and then ask the Supreme Court, there are easier and cheaper ways to resolve disputes. Absolutely. And I mean, truthfully, in 99 percent of the cases of an interchange of choosing an interchange facility, carriers do reach a mutual agreement about which location they want to use based on the specific traffic in a specific direction under specific circumstances. They weigh that burdens and benefits and they decide, you know, mutually how they're going to allocate the costs and how they're and where they're going to interchange. It is only these. Maybe the Department of Governmental Efficiency will solve this. From your lips to God's ears. I do think that these are the kinds of disputes, though, that, you know, Wisconsin Central did not did not seek a judicial interpretation of the contract here. They they came to the board under Section 10742, which I mean, I can't read their minds, but it indicates an understanding that there is a statutory question here that needs to be answered by the board. And the word reasonable, even under Loper-Bright, is a relatively flexible term that the board can give meaning to through case by case fact specific adjudication. That's what it did here. It did not say I mean, it held very narrowly. It did not say that clearing is never a reasonable interchange location for these parties. It did not say that Wisconsin Central has to pay 100 percent of those fees. It simply said under the specific facts and circumstances under which Wisconsin Central is demanding delivery at clearing, it is not overall reasonable for this traffic, these directions, this this specific circumstances. And I mean, if the court does not have any further questions, I respectfully request that you affirm. Thank you, counsel. Mr. Rifkind. Good morning, Your Honor. In this proceeding, Wisconsin Central is asking this court to sanction this reasonable new interchange regime that would empower receiving carriers that currently provide, as required by statute, facilities for interchange to force a delivering carrier instead to use and pay a middleman to affect that interchange, allowing receiving carriers or receiving railroads unilaterally to shift significant costs of interchange, the significant cost of providing an interchange facility without responsibility for the costs and burdens on the interchange process that such a choice imposes encourages opportunistic behavior that is harmful to the rail system. Here, Wisconsin Central's choice of clearing imposes several costs and burdens on the work that the BRC, now the middleman, has to do. It's duplicative of work that the, that Soo Line is doing in its own yards. It adds train traffic into the core of the Chicago terminal, the congested core, and it adds risk of cars clogging Soo's yard and system when clearing becomes congested. And I say when because it's not a question of if. We have ample examples, including while this remand was pending, of clearing becoming congested and clogging Soo's yard. And when that happens, it also affects the network, Soo's system, as well as the interconnected national rail network. The STB recognized these harms as supporting its reasonableness determination. That's in the short appendix at 12 and 13. And just as important, were the law here to allow carriers like Wisconsin Central to take action without regard for the impacts on others, the result would be chaos at numerous terminals across the rail network. The BRC agreement and the terminal railroad set up here is not unique. And the STB properly recognized this, too, as a basis for finding Wisconsin Central's proposal unreasonable. Ultimately, the question for this court is not is the agency's judgment correct, but rather did it engage in reasoned decision making? It did, and we think the court should affirm. In my 11 seconds left, I just want to point out and address the question that you asked Judge Easterbrook, why is there no, no, no arbitration provision? And I think the answer is a little late for that.  Thank you very much, counsel. Anything further, Mr. Moss-Wheaton? Your Honors, my friend from the board said that Wisconsin Central did not seek a judicial interpretation of the contract. That is not correct. We asked the board in the first instance to interpret the contract and explicitly and alternatively asked that if the board was uncomfortable interpreting this private agreement, that it adopt some resolution, whether a pause or a conditional order or something that would allow us to go to a court and get a judicial interpretation of the contract. The board did not do that and did not explain why it was not doing that. Instead, it merely proceeded as if, as it has argued here, as it has argued in its briefs, the contract does not contemplate sue line paying for traffic that arrives at clearing under a statutory designation. So the fact that the board did not purport to interpret the contract, as Ms. Chaykin said, is precisely the problem. As to the operational issues that Mr. Rifkind emphasized, he conceded in front of the agency and the board found that clearing is operationally reasonable. I don't think there is any question that aside from the who pays issue that the board decided based on its assumptions about the contract, we would have prevailed below because operational reasonableness was conceded. And that is really the key factor going back 100 years under the agency's precedence. Finally, Mr. Rifkind emphasized comments, including from some of our co-owners of the belt, about the potential consequences of adopting our position. But our position is quite narrow and is constrained in meaningful ways by the contract and by the reciprocity that is inherent in interchange arrangements, which the board itself emphasized. Thank you. Thank you very much, counsel. Case is taken under advisement. The court will take a brief.